**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GEMMA POWER SYSTEMS, LLC, | : |
| | : |
| Plaintiff, | : Case No. 1:19-cv-00705 |
| | : |
| v. | : |
| | : **SECOND AMENDED COMPLAINT** |
| EXELON WEST MEDWAY II, LLC, and | : |
| EXELON GENERATION COMPANY, LLC, | : |
| | : |
| Defendants. | |

Pursuant to the Court's Order (*see* ECF No. 34, 35), Plaintiff, GEMMA POWER

SYSTEMS, LLC, by and through its attorneys, Gordon Rees Scully Mansukhani, LLP, bring this

Second Amended Complaint against the Defendants, EXELON WEST MEDWAY II, LLC, and

EXELON GENERATION COMPANY, LLC and allege as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff, Contractor, GEMMA POWER SYSTEMS, LLC (hereinafter

"GEMMA"), entered into a contract with Defendant, Owner, EXELON WEST MEDWAY II,

LLC (hereinafter "EXELON") to engineer, procure and construct a power plant facility in

Medway, Massachusetts (the "Project"). Throughout the course of the Project, GEMMA

encountered various events which negatively impacted the schedule and costs of the Project.

EXELON consistently ignored, disputed, obstructed or disregarded GEMMA'S numerous

attempts to communicate with EXELON and rectify these issues. Ultimately, these events, and

EXELON'S failure to remedy them, left GEMMA unpaid for completed work in excess of $75,000

(Seventy-Five Thousand Dollars), the jurisdictional limit of this Court. GEMMA, EXELON and

EXELON GENERATION COMPANY, LLC shall hereinafter be collectively referred to as the

"PARTIES".

## PARTIES

2.      Plaintiff GEMMA POWER SYSTEMS, LLC (hereinafter "GEMMA") is a limited liability company and its sole member is Argan, Inc.  Argan, Inc. is a Delaware corporation with its principal place of business at One Church Street, Suite 201, Rockville, Maryland.

3.      Defendant EXELON WEST MEDWAY II, LLC (hereinafter "EXELON") is a limited liability company.  Upon information and belief, Defendant EXELON's sole member is Exelon New England Holdings, LLC, whose sole member, in turn, is Exelon Generation Company, LLC.   Exelon Generation Company, LLC's sole member is Exelon Corporation.   Exelon Corporation is a Pennsylvania corporation with its principal place of business at 10 South Dearborn Street, Chicago, Illinois.

4.      Defendant EXELON GENERATION COMPANY, LLC (hereinafter "EXELON GC") is a limited liability company.  Upon information and belief, Defendant EXELON GC's sole member is Exelon Corporation.   Exelon Corporation is a Pennsylvania corporation with its principal place of business at 10 South Dearborn Street, Chicago, Illinois.   EXELON GC guaranteed the performance of EXELON WEST MEDWAY II, LLC on the Project pursuant to Exhibit Z of the Contract (*see* Paragraph 9 herein and **Exhibit B** to this Complaint – The Guarantee Agreement).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists among the PARTIES, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs, in damages.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3), because

GEMMA, EXELON and EXELON GC are subject to this Court's personal jurisdiction.  On or about August 3, 2015, GEMMA and EXELON executed the Turnkey Engineering, Procurement and Construction Contract ("the Contract"), a written agreement in which Gemma served as the contractor to build a power plant for EXELON.   Exhibit Z of the Contract is a Guarantee Agreement under which EXELON GC guaranteed the performance of EXELON under the Contract (hereinafter the "Guarantee Agreement").   Pursuant to Section 14.6 of the Contract and Paragraph 17 of the Guarantee Agreement, the PARTIES agreed that any dispute, controversy, or claim "arising out of, relating to, or in any way connected" to the Contract, including any breach thereof, would be governed and enforced in accordance with the laws of New York. Furthermore, pursuant to Section 14.7(b) of the Contract and Paragraph 18 of the Guarantee Agreement, GEMMA, EXELON GC and EXELON agreed that any legal proceedings brought with respect to the Contract and/or Guarantee Agreement would "be brought exclusively in the federal courts of the U.S. or the courts of the State of New York, in each case located in the County of New York." Accordingly, venue is proper in this Court.

7.     GEMMA has exhausted all dispute resolution requirements and preconditions to bringing this lawsuit required by its Contract prior to filing this lawsuit against EXELON and/or EXELON GC.

## FACTS

### THE PROJECT AND CONTRACT

8.     Plaintiff GEMMA is a leading engineering, procurement, and construction company with extensive experience in the development, design, construction, commissioning, and operation of large-scale power plant projects.

9.     On or about August 3, 2015, GEMMA and EXELON executed the Contract for

GEMMA to engineer, procure, and construct a dual-fuel simple cycle power plant Facility (the "Project" and/or "The West Medway II Facility"), in Medway, Massachusetts.  Pursuant to Exhibit Z of the Contract (the Guarantee Agreement), EXELON GC guaranteed the performance of EXELON on the Project.  The Contract is too voluminous to attach hereto, however a true and correct copy of the Terms and Conditions of the Contract, along with Exhibit Z are attached hereto and incorporated herein as **Exhibit A**.

10.    The original contract price for equipment, services, deliverables, work, costs, and completion of all obligations by GEMMA was $98,750,000.00 (Ninety-Eight Million, Seven Hundred and Fifty Thousand Dollars and Zero Cents).

11.    Soon after GEMMA signed its contract on August 3, 2015, EXELON formally suspended GEMMA'S Work from August 29, 2016 until April 25, 2017. The Suspension changed the Project Substantial Completion Date 196 days from April 17, 2018 to October 30, 2018.

12.    GEMMA was not provided full site access to the project until August, 15, 2017. From April 26, 2016 until October 30, 2017, EXELON introduced approximately $20,000,000 (Twenty Million Dollars) of additional work to the Project, the majority of which occurred prior to GEMMA having access to the job site or receiving its Notice to Proceed.  In total, the Change Orders executed by the PARTIES between April 25, 2016 and October 31, 2017, increased the total contract value of the Project from $98,750,000.00 (Ninety-Eight Million, Seven Hundred and Fifty Thousand Dollars and Zero Cents) to $118,952,645.00 (One Hundred Eighteen Million, Nine Hundred Fifty-Two Thousand, Six Hundred Forty-Five Dollars and Zero Cents).  These changes included suspension costs, changes to the site plans, changes to the GEMMA purchased equipment, an increase to the noise wall allowance and ground grid revisions due to high soil resistivity revealed by new geotechnical information.

**DISPUTED WORK**

13.     As the Project progressed, GEMMA continued to encounter additional delays and changes that increased costs. While these subsequent events negatively impacted the Project, GEMMA continued to fulfill its obligations and complete the work pursuant to the Contract.

14.     The disputed events and delays were caused by a variety of events including, but not limited to, Owner Delay, Force Majeure Events, and Original Equipment Manufacturer ("OEM") issues. GEMMA notified EXELON of each event pursuant to the requirements of the Contract, and submitted numerous Change Order Requests ("CORs") in an effort to notify EXELON of and resolve the increased costs of the Project. EXELON disregarded or disputed each request and has failed to remit payment to Gemma for any of its completed work on these matters. With the exception of Change Order No. 5, once GEMMA was on the jobsite EXELON refused to issue GEMMA any additional Change Orders.  GEMMA has incurred additional changes, extra work, impacts and delays in an effort to timely complete its work on the Project without any resolution by EXELON.

**NOISE MITIGATION**

15.     The contract price included an allowance for Noise Mitigation which included a Noise Wall and associated infrastructure.   The allowance is a portion of the contract price which is not fixed but rather, is agreed between the parties to be adjusted based upon actual incurred cost plus a mark-up.  This Allowance is detailed in Section 3.1 of the Contract.   Pursuant to this part of the Contract scope, GEMMA entered into Subcontracts with various subcontractors to perform the work required to fulfill the scope of the Noise Mitigation Work.   Exelon was kept well informed and consented to the entry into each of these subcontracts.  However, Exelon was indecisive and interrupted and changed the methods and timing of executing these subcontracts

significantly impacting Gemma's ability to manage the work, then complained about the costs and refused to increase the contract value due to the growth in the NOISE Wall Allowance

16.     Subsequently, there were cost overruns due to Exelon's actions and requests and when GEMMA sought to recover these costs (pursuant to the Contract Allowance clause in Section 3.1), EXELON rejected GEMMA'S COR's for the additional cost of the noise wall installation and has refused to approve a CO for the increased cost. GEMMA completed significant Noise Mitigation Work which has enhanced the Facility and benefited EXELON.  To date, EXELON has also refused to remit payment to GEMMA and its subcontractors for the completion of work on the noise walls.

## OWNER CAUSED DELAY

17.     As the project progressed, many issues related to the OEM equipment supplied by Exelon arose.  Rather than allow Gemma to proceed with the required changes, EXELON chose to have its subcontractors perform changes to the Original Equipment Manufacturer ("OEM") in order to avoid entering into additional Change Orders with GEMMA.   EXELON refused to coordinate the work of its subcontractors with GEMMA'S work.  As a result of EXELON'S actions, GEMMA incurred unpaid costs and was adversely impacted by EXELON'S inability to provide Owner Supplied Equipment in accordance with the Contract.  By way of example, and not limitation, EXELON allowed the OEM to extend their factory work to correct OEM equipment defects. The OEM work in the field was performed with little regard to GEMMA activities which further contributed to negatively impacting GEMMA performance of its scope of work.

18.     This addition of manpower, lack of notification, and poor coordination resulted in interferences with GEMMA'S work and productivity through trade stacking.  In accordance with the EPC Contract GEMMA is obligated to provide management of OEM site activities.  In order

to fulfill its obligations, GEMMA worked to manage and coordinate the work at the site to minimize cost and schedule impacts.  For example, GEMMA repeatedly requested schedule updates and work plans from the OEM and EXELON so that GEMMA could plan its work and allocate resources accordingly. The OEM refused to provide schedules or work plans, and EXELON consistently failed to enforce its Contract with the OEM.  EXELON allowed the OEM to ignore GEMMA'S requests for site coordination and conceal its site work in order to minimize GEMMA'S ability to seek cost and schedule relief due under the EPC Contract.

19.     EXELON also impacted Project execution by its inaction and interference[1] with the Project. EXELON repeatedly failed to provide timely responses to GEMMA for requests for technical information, Owner reviews and coordination of activities. The delay and resistance demonstrated by EXELON created additional cost to GEMMA and contributed to schedule delays.

## FORCE MAJEURE

20.     Throughout the course of the Project, GEMMA encountered multiple Force Majeure events that negatively impacted the costs and schedule of the Project.  By way of example, and not limitation, the Force Majeure events include: Hurricane Harvey, Hurricane Irma, Winter Storm Elsa, Winter Storm Grayson, fires, and other events impacting the Project site and productivity.

21.     GEMMA notified EXELON pursuant to the Contract of each event, and submitted CORs[2] accordingly. EXELON rejected each COR for these Force Majeure events. Despite

---

[1] Examples of Exelon's inaction and interference with the Project include, but are not limited to: (1) delays in coordination with the grid operator during design, construction, and commissioning; (2) indecision on noise wall execution; (3) delays in the grounding grid design and change order negotiation and execution; (4) delaying the negotiation of Change Order Requests and then refusing to issue Change Orders;  (5) last minute changes to the noise wall installation allowance; (6) delays in review of test procedures; (7) refusal to allow weekend work; (8) shipping and storing of combustion turbine; and (9) delays in review of deliverables.

[2] CORs 030, 040, 041, 052, and 053.

GEMMA'S numerous attempts to provide detailed information on each events impacts to the Project, EXELON rejected GEMMA'S CORs. To date, EXELON has refused to approve a CO for GEMMA'S increased costs as a result of Force Majeure events that were entirely out of GEMMA'S control.

## ADDITIONAL COST IMPACTS

22.    In addition to the events described above, the following events, changes, and delays impacted the costs of the Project:

a.  Encountering unexcavatable rock;

b.  Addition of devices, work, and modifications by EXELON;

c.  Additional work imposed on GEMMA for EXELON approved Site Work Orders;

d.  OEM equipment defaults and late deliveries;

e.  Refusal of OEM to provide adequate planning for its craft work;

f.  Defects and deficiencies in information provided in OEM documentation;

g.  Incorrect information provided by Exelon supplied OEM Technical Advisors

h. Refusal to support GEMMA's schedule with work performed by the OEM

i. Late submission of OEM documentation and installation requirements to GEMMA after execution of the EPC Contract

j. Improper and unfair interpretation of EPC Contract documentation by Exelon in order to impose additional work upon GEMMA and inhibit GEMMA ability to seek cost and schedule relief.

k.Multiple issues with Owner Supplied Equipment; and

l.  Changes to turbine and exhaust installation.

m. Performance of additional training of EXELON staff

n. Purchase of spare parts by GEMMA for EXELON

o. Interfering with GEMMA's subcontractors through direct contact by Exelon without informing or coordinating with GEMMA

23.     These events and those detailed above caused direct and material impacts to GEMMA'S productivity, progression of work, perform its obligations to manage the OEM, and its ability to effectively manage its subcontractors and costs of the Project.

## GEMMA'S EFFORTS TO MITIGATE

24.     GEMMA took significant steps to mitigate impacts to the Project and EXELON. GEMMA expended considerable resources in investigating, discovering, and proposing solutions to EXELON after and during each disputed event.

25.     GEMMA consistently attempted to implement corrective actions for the multiple defects and deficiencies encountered during the Project. GEMMA also coordinated with its subcontractors to validate cost and schedule impacts in order to relay them to EXELON and mitigate impacts to the Project.

26.     EXELON has benefited from GEMMA'S mitigation efforts in the form of avoiding further schedule impacts to the Project. Furthermore, EXELON maintains the benefit of the work performed on these disputed events that it has not rendered payment for.

27.     GEMMA submitted payment requests to EXELON requesting payment for services rendered on the Project. Each request submitted included the amount of the agreed upon Contract between the PARTIES and the amount due.

28.     EXELON and EXELON GC have repeatedly denied, ignored, and disregarded numerous requests, submissions and demands for EXELON and EXELON GC to remit payment to GEMMA to date, GEMMA is owed an amount to be proven at the time of trial, but in excess of $75,000, the jurisdictional limit of the Court.

## EXELON'S WRONGFUL TERMINATION OF GEMMA

29.     It is a matter of record (See ECF No. 1) that GEMMA filed its Complaint in the above-captioned lawsuit on January 24, 2019.  EXELON was served with GEMMA'S Complaint in February of 2019.  Despite suing EXELON to protect and enforce its rights, GEMMA continued to perform its Contract Work on the Project and remained committed to finishing its Work.

30.     On March 6, 2019, EXELON notified GEMMA via telephone that it was terminated from the Project.  EXELON instructed GEMMA to stop all of its Work on the Project and escorted all GEMMA personnel from the jobsite, thereby preventing GEMMA from accessing the Project site so that GEMMA could complete its Work on the Project.  At the time GEMMA was escorted from the Project site, GEMMA was more than ninety-eight percent (98%) complete with its Contract Work on the Project.  To date, GEMMA has been denied access to the Project site to complete its Work on the Project.

31.     On March 7, 2019, EXELON notified GEMMA via written letter that it was terminated from the Project effective immediately pursuant to Section 12.3 of the Contract due to unspecified and unidentified "Contractor Event(s) of Default."

32.     Pursuant to the written terms of the Contract, a termination by EXELON of GEMMA for default is not effective unless given in writing in accordance with Section 14.9 of the Contract.  *See* Contract, at Section 12.3.  *See, generally,* Article 12 of the Contract ("Termination").

33.     EXELON termination of GEMMA was nothing more than retaliation for GEMMA'S lawsuit against EXELON (See ECF No. 1), was in bad faith and EXELON did not comply with the express terms and conditions of the PARTIES' Contract when it wrongfully terminated GEMMA.  EXELON's March 6, 2019 termination of GEMMA interfered with

GEMMA's and/or the GEMMA's subcontractor's(s)' right to perform pursuant to the Contract and was a material breach of the Contract.

34.     EXELON's own material breaches of the CONTRACT, including but not limited to its failure to adhere to the strict CONTRACT terms regarding termination, precludes EXELON's right to enforce the CONTRACT against GEMMA and further precludes EXELON's right to recover any damages thereunder against GEMMA.

## CLAIMS FOR RELIEF

### COUNT I: BREACH OF CONTRACT

35.     GEMMA repeats, re-alleges, and incorporates all of the allegations set forth in paragraphs 1 – 34 as though fully set forth herein.

36.     On or about August 3, 2015, GEMMA entered into a binding agreement (the "Contract") with Defendant, EXELON.  The Contract was supported by valuable consideration. See **Exhibit A**.  Defendant EXELON GC guaranteed the performance of EXELON under the Contract pursuant to Exhibit Z of the Contract, the Guarantee Agreement attached hereto as **Exhibit B**.

37.     GEMMA has fully performed all of its Work pursuant to the terms and conditions of the Contract save for any performance for which GEMMA has been excused by the actions and/or inactions of EXELON and/or EXELON GC, or performance of which was waived by EXELON and/or EXELON GC or the terms and conditions of the Contract, to include the Guarantee Agreement.

38.     EXELON and/or EXELON GC has materially breached the terms of the Contract and/or Guarantee Agreement by:

a) failing and refusing to pay GEMMA its full amounts due under the Contract for all base

Contract and/or extra work required by EXELON'S directives despite EXELON'S demand therefore and without reasonable basis or bona fide dispute regarding payment;

     b) failing to issue and approve Change Orders;

     c) causing delays and disruptions to GEMMA'S Work and the Work of GEMMA'S subcontractors;

     d) failing to coordinate the Work of EXELON'S subcontractors and suppliers with GEMMA'S Work on the Project;

     e) failing to approve GEMMA'S (and its subcontractors and/or suppliers) submittals in a timely manner;

     f) failing to enforce EXELON'S OEM Contracts;

     g) interference with GEMMA'S subcontractors;

     h) failure to deliver and supply Owner supplied materials in a timely manner;

     i) failure to perform the material terms of the Guarantee Agreement;

     j) failure to follow the material terms of the Contract;

     k) Direct interference with local labor both on the site and through discussions with GEMMA's subcontractors causing disruption and labor unrest;

     l) Interfering with GEMMA's and/or GEMMA's subcontractor's(s') right to perform under the Contract by wrongfully terminating GEMMA in-fact and not in accordance with the express terms of the Contract; and

     m) Retaliating against GEMMA in bad faith and in violation of the covenant of good faith and fair dealing implied in every Contract.

     39.     Neither EXELON'S nor EXELON GC's material breach of the Contract (and its Guarantee Agreement) is excused under the law or under the Contract.

40.     As a direct result of EXELON'S and/or EXELON GC'S material breach of the Contract, GEMMA has suffered damages in an amount to be proven at the time of trial, but in excess of $75,000, the jurisdictional limit of the Court for unpaid work, delays, disruption and impacts.

## COUNT II: WRONGFUL TERMINATION

41.     GEMMA repeats, re-alleges, and incorporates all of the allegations set forth in paragraphs 1 – 40 as though fully set forth herein.

42.     The Contract, at Article 12, expressly outlines the requirements for any termination for default of GEMMA by EXELON.

43.     EXELON failed to comply with the express termination for default terms of the Contract when it escorted GEMMA off the Project site, interfered with GEMMA's and/or its subcontractor's(s') ability to perform and complete their Work, denied GEMMA and its subcontractors access to the Project site to complete their Work and terminated GEMMA in-fact without written notice.

44.     EXELON terminated GEMMA without legal justification for doing so.  At the time of EXELON's termination in-fact of GEMMA, Gemma was not less than 98 percent complete with its Contract Work and was not in material breach of any Contract provision.

45.     EXELON's wrongful termination of GEMMA was in material breach of the Contract.

46.     As a result of EXELON's wrongful termination, EXELON cannot enforce the terms of the Contract against GEMMA and is precluded from recovering damages against GEMMA thereunder.

47.     As a result of EXELON's wrongful termination, GEMMA is entitled to recover all

unpaid sum it has expended on its Work, all costs incurred as a result of EXELON's wrongful termination of GEMMA, lost profits and consequential damages, in an amount to be proven at the time of trial, but in excess of $75,000, the jurisdictional limit of the Court.

## COUNT III: QUANTUM MERUIT

48.     GEMMA repeats, re-alleges, and incorporates all of the allegations set forth in paragraphs 1 – 47 as though fully set forth herein.

49.     GEMMA fully performed all of the terms and conditions of the Contract.

50.     GEMMA performed this work on the Project with the expectation that it would be paid for said work.

51.     EXELON knew, or should have known, that GEMMA expected to be paid for all of its work performed on the Project, to include all extra contractual ("extra work") and Change Directive and Change Order work.

52.     EXELON has received the benefit of GEMMA'S work on the Project without making payment to GEMMA for the full value of GEMMA'S work.

53.     EXELON wrongfully terminated GEMMA for default in material breach of the Contract and in bad faith in violation of the implied covenant of good faith and fair dealing.

54.     The actions, conduct, and or failures of EXELON to pay GEMMA for its work, services, labor, equipment, and materials have provided EXELON a benefit for which GEMMA is entitled to be paid.  GEMMA is entitled to recover in *quantum meruit* for the reasonable value of its work, services, labor, equipment, and materials in an amount to be proven at trial.

55.     GEMMA is entitled to judgment against EXELON for the reasonable value of the benefit conferred upon EXELON from the work performed by GEMMA on the Project.

56.     GEMMA has completed unpaid work in an amount to be proven at the time of trial,

but in excess of $75,000, the jurisdictional limit of the Court.

## COUNT IV: UNJUST ENRICHMENT

57.     GEMMA repeats, re-alleges, and incorporates all of the allegations set forth in paragraphs 1 – 56 as though fully set forth herein.

58.     During the course of the Project, GEMMA was asked by EXELON to provide, and did provide, valuable labor, materials and equipment and/or supplies on the Project for the benefit of EXELON which was not part of its original Contract with EXELON.  GEMMA also performed Change Order work at the request of EXELON on the Project.  EXELON had knowledge and notice that it was receiving the benefit of GEMMA'S extra work and Change Order Work on the Project.   GEMMA'S base contract work, extra work and the Change Order work, and each of them, constituted a benefit conferred upon EXELON'S property and the Project.

59.     To date, EXELON has failed and refused to pay GEMMA the full value of the benefits conferred on its property due to GEMMA'S extra contractual work performed on the Project.  EXELON was enriched at GEMMA'S expense.

60.     To date, EXELON has failed and refused to pay GEMMA the full value of the benefits conferred on its property due to GEMMA'S Change Order work performed on the Project.  EXELON was enriched at GEMMA'S expense.

61.     It would be against equity and good conscious to permit EXELON to retain any benefit conferred upon its property without paying GEMMA for its value.  Unless EXELON is made by this Court to pay GEMMA for the reasonable value of the aforementioned extra work, Change Directives and Change Order work, EXELON will obtain a benefit in an amount to be proven at the time of trial, but in excess of $75,000, the jurisdictional limit of the Court, to its property and Project without adequately compensating GEMMA therefore.

62.    GEMMA seeks payment from EXELON for all extra contractual and unpaid Change Order work which it performed on the Project and for which EXELON has failed to pay GEMMA in full for to date.

## PRAYER FOR RELIEF

WHEREFORE, having set forth the above facts and having alleged the above causes of action, Plaintiff GEMMA POWER SYSTEMS, LLC prays for the following:

A. Judgment against EXELON and/or EXELON GC for an amount not yet fully ascertained, but in excess of $75,000, the jurisdictional limit of the Court, to be proven at trial.

B. For an award of attorneys' fees, expenses and costs pursuant to Section 14.7(e) of the Contract and Section 4 of the Guarantee Agreement.

C. That GEMMA have such other further relief as the Court deems just and equitable.

Dated: March 29, 2019

Respectfully submitted,


By:  */s/ Erik C. DiMarco*_____
        Erik DiMarco
        Virginia Squitieri

Edimarco@grsm.com
Vsquitieri@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
One Battery Park Plaza, 28th Floor
New York, NY 10004
Phone: (212) 269-5500
Fax: (212) 269-5505


By: */s/ Allen W. Estes, III*_____
        Allen W. Estes, III
        *Admitted Pro Hac Vice*


SECOND AMENDED COMPLAINT

Aestes@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
701 Fifth Avenue, Suite 2100
Seattle, WA 98104
Phone: (206) 695 5100
Fax: (877) 634-8323

ATTORNEYS FOR PLAINTIFF
GEMMA POWER SYSTEMS, LLC